# BRUCE K. KAYE
**ATTORNEY AT LAW**
**11 Park Place, Suite 1801**
**New York, New York 10007**
**Tele (212) 385-8000**
**Fax: (212) 385-7845**
**bruce@baraschmcgarry.com**

<u>VIA ECF</u>

April 20, 2020

The Honorable P. Kevin Castel
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street, Courtroom 11D
New York, New York 10007

Re: **United States v. Saeed Malik Norris**
   **<u>18-CR-871 (PKC)</u>**

Dear Judge Castel:

   With 44 of the only 50 tests administered to Westchester County Jail inmates having returned positive results, Mr. Norris moves the Court for an order pursuant to 18 U.S.C. §3145(c) granting his release on bail from the Westchester County Jail, pending sentencing, or until such time as the Court determines that the unique threat that continued incarceration during the COVID-19 pandemic constitutes to his already compromised health has fully dissipated. (The source of this factual allegation is the 4-17-2020 email sent by SDNY AUSA Perry Carbone to Hon. Cathy Seibel and Federal Defender Jennifer Brown, Esq.)

   The defense respectfully proposes release on a personal recognizance bond of $100,000 cosigned by his mother and his grandmother and fully secured by the equity his mother has amassed in her $500,000 Legion Street, Brooklyn home. See, e.g., <u>United States v. Haney</u>, 13-cr-541 (JSR) (S.D.N.Y. April 14, 2020)(where while noting that in normal times such an application would be frivolous on its face, compassionately releasing defendant who had served only 9 months of a 33-month sentence for selling narcotics and laundering the proceeds because "these are not normal times. The rapid spread of COVID-19 has caused a public health crisis and a national emergency that can be best reduced by the kind of social distancing not easily attained in an overcrowded federal prison facility"); <u>United States v. Lopez</u>, 19-cr-323 (JSR)(S.D.N.Y. March 23, 2020) (denying request for detention of defendant who pled guilty to conspiracy to commit Hobbs Acts robbery and use of a firearm finding that "the coronavirus situation does create, on its own, an exceptional circumstance possibility," "the number of [coronavirus cases] has been increasing by a

substantial percentage each day," the pandemic "creates a danger if [the defendant] is placed in a prison facility, regardless of where that facility is, while the virus is still increasing exponentially throughout the United States," and "the Bureau of Prisons is not really equipped to deal with this in anything like the way one would ideally want").

Mr. Norris respectfully suggests that his release be subject to the following conditions: (a) home incarceration with electronic monitoring; (b) that his former bedroom in the Legion Street home first be inspected for any electronic devices, i.e., computers, smart phones, etc., with internet access, non-prescription controlled substances or firearms, and the residence be approved pre-release by Pretrial Services and/or Probation; and (c) his cohabitants, his mother and maternal grandmother, submit to on-demand searches of the browsing histories of their own password-protected computers and smart phones for the duration of his release; (d) mental health treatment, see PSR ¶¶ 90-95, p. 23 (specifying defendant's use of narcotics and recommending the imposition of a supervised release condition requiring outpatient drug treatment); McCarthy February 19, 2020 Psychosexual Evaluation, at 5; (e) full compliance with all other standard conditions of release, including no victim contact.

A.    Factual Background

On November 14, 2019, the now 25-year-old HIV-afflicted Mr. Norris pled guilty pursuant to a plea agreement to the sole court of a superseding Information charging that, from July through August, 2016, he used a smart phone to persuade minors to engage in unlawful sexual activity in violation of 18 U.S.C. §2422(b). The §2422(b) statutory minimum term of imprisonment is 10 years and the maximum term is life. While the October 23, 2019 plea agreement forecast a Category II Criminal History guidelines range of 135-168 months, PSR at ¶¶5(c)(iii), 113, according to the Probation Department's calculations, Mr. Norris's total offense level remains at 32, but his Criminal History Category is III, increasing the guideline range to 151-188 months of imprisonment. Id. at ¶¶53, 112.

B.    The Standard of Review of an 18 U.S.C. §2422(b) Offender's Bail Application

18 U.S.C. §3143(a)(2) and 18 U.S.C. 3142 (f)(1)(a) govern release pending sentence of a defendant convicted of 18 U.S.C. §2422(b), and require detention "unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released." See United States v. DiSomma, 951 F.2 494, 496 (2d Cir. 1991) ("The second category mandates detention for persons found guilty of crimes encompassed in section 3142(f)(1)(A)…). 18 U.S.C. §3145(c), however, permits the conditional release of such mandatory detainees if they "meet the requirements for release under section 3143(b)(1), and "it is clearly shown that there is exceptional reasons why such person's detention would not be appropriate." 951 F.2d at 496.

It is Section 3143(a)(1), then, that establishes the threshold requirements that a §1591 offender must meet. To satisfy those requirements, the Court must find that the person is *unlikely* to flee or pose a danger to the safety of any other person or the community. 18 U.S.C. §3143(a)(1). It is only after the defendant makes that predicate §3143(a)(1) showing

that the court should consider whether the presence of the §3145(c) exceptional circumstances making detention inappropriate. DiSomma, 951 F.2d 494.

C.      The §3143(a)(1) Analysis

     1.   The Prior Bail Applications.

     When, on December 12, 2018, Magistrate Judge Cott first denied bail over Pretrial Services's release recommendation, he did so on the government's representation that there were four "particularly vulnerable" minor victims who "the defendant intentionally recruited … to come and work for his prostitution business" for a two month time period in July and August of 2016. The government proffered that it had spoken to "a total of six minor victims" who "described being worked as prostitutes by this particular defendant" and that recorded conversations with co-conspirators through May of 2018, in substance indicated that "the defendant is continuing to work particular girls, including some of the minor girls." December 12, 2018 Bail Hearing, at 5.[1]  The government Magistrate Judge Cott discounted the flight factor but, crediting the Government's proffer on defendant's danger, expressed "concern" that the evidence here against this defendant is very strong," and that minors in the community could not be protected from Mr. Norris on his daily commute to work, and therefore denied bail.  December 12, 2018 Bail Hearing, at 16-20. Significantly, the government conceded that Mr. Norris did not engage in force, threats of force or coercion.

     Four months later, at the time of his March 29, 2019 application to this Court, the Government's representation of the scope of Mr. Norris's culpability has dwindled from six victims who Mr. Norris personally pressed into prostitution to "a minor victim" and "multiple other victims who *either were approached* to engage in prostitution by Mr. Norris *or* did, all within the July to August 2016 period charged in the Indictment. March 29, 2019 Bail Proceeding at 11-12.[2]  The Court denied release, expressing concern that Mr. Norris

---

[1] Ms. Bracewell: …The conspiracy count includes reference to four minor victims. As noted, these were four minor victims that were coming from a particular facility within the Social Services system. We'd like to note that these were particularly vulnerable victims. They were wards of the State, and this is not an exhaustive list of victims of this defendant. We can proffer that we have in total six minor victims who we have spoken with who have described being worked as prostitutes by this particular defendant. So we would just like it to be very clear that these two counts represent a great deal of conduct.
With respect to the actual trafficking, the time range in the indictment is July 2016 to August 2016. Again, we'd like to make an additional proffer on those dates. We have subsequent prison calls –
The Court:  Subsequent what?
Ms. Bracewell: Recorded prison calls between the defendant and various co-conspirators in which continue to discuss prostitution and some of the same minor victims that we've identified going through I believe March of 2018 – or May of 2018, excuse me. And these in substance indicate that the defendant is continuing to work particular girls, including some of the minor girls that were – have described working for him between – within the summer of 2016. December 12, 2018 Bail Proceeding at 5-6 (emphasis added).

[2] Mr. Gutwillig: …The defendant's conduct in this case is particularly egregious because the trafficking involved a minor victim who was part of the social services system. In addition to the victim charged in the indictment, law enforcement has also spoken with multiple other victims who either were approached to engage in prostitution by Mr. Norris or did. The government would also note that the time period in the indictment, which is the summer of 2016, is during that time, as noted by the pretrial services report, Mr. Norris was on parole until August of 2016 for the burglary conviction.

committed the instant offense while on parole from a prior conviction, that it could be
repeated remotely from home detention through internet advertisements, that he had mental
issues, "faces a substantial prison term … and has a history of not complying with the terms
of parole." Bail Proceeding at 13-14.

The Government will concede, I suspect, not only that the telephone contact number
on the Backpage.com ads was not Mr. Norris's but also that other men prosecuted as sex
traffickers in this investigation used Mr. Norris's email address to post Backpage.com ads.
This suggests strongly that because the young women themselves were the sole commonality
between separate schemes, involving separate individuals, that it was the "vulnerable"
victims themselves who supplied Mr. Norris's email address to the other traffickers.

Mr. Norris subsequently set forth the full scope of his responsibility in an allocution,
to which the Government did not object:

"Between July and August of 2016, I knew that an individual under the age of 18 –
I knew that an individual under the age of 18 was engaging in acts of prostitution. The
government refers to that individual as Victim 1. I also knew that Victim 1 was associated
with other individuals under the age of 18 that were also engaging in acts of prostitution. The
government refers to these individuals as Victim 2 and Victim 3.  During this time, I intended
to further a scheme to entice Victim 1, 2 and 3 to engage in further acts of prostitution by
permitting Victim 1 to use my cell phone and my email account to post online internet
advertisements offering herself and Victim 2 and 3 as prostitutes.

I also arranged for Victim 1, 2 and 3, after an eviction to use the apartment – to use
another apartment from another individual to engage in acts of prostitution. While I was
located in Brooklyn, New York, at the time that I performed these acts, I understand that the
advertisements would be seen by potential customers all throughout the New York City and
metropolitan area, including the Southern District of New York."

2.   The Offense Conduct Described in the PSR is Inaccurate and Misleading.

Mr. Norris has acknowledged his guilt of facilitating a serious offense but even
overwhelming evidence of guilt does not, alone, justify detention. See 18 U.S.C.
§3142(g)(1),(2),(4). In assessing the danger he poses to the community, Mr. Norris seeks to
be measured by the benchmark of his own offense conduct[3] and not for the apparently
generic role that at least one of the victims appears to have ascribed to another individual
prosecuted and tried for his role in the investigation.

---

Additionally, in terms of discovery the government has provided to the defense, this includes escort
advertisements identified *using* Mr. Norris's account on the website backpage.com, prison calls, including a prison call, I
believe it's from 2017, discussing prostitution activities. The production so far, the charges, the presumption, and the
mandatory minimum, which poses, in the government's view, a risk of flight were the defendant to be released, would
support continued detention. March 29, 2019 Bail Proceeding at 11-12 (emphasis added).

[3] The Court:  I will order a presentence investigation report and direct that no interview of you take place unless your
lawyer is present. It's important that you be candid, truthful, and honest with the people who prepare the report. Tell
them the good things and even the not so good things, because the report will be important in my decision on sentencing.
P. 19-20 (emphasis added).

In that regard the Court we bring to the Court's attention that Mr. Norris expects to contest the PSR at ¶¶10-15 allegations that he "suggested [that then-16-year-old Victim 2] engage in prostitution" or stated, "Do you wanna be my hoe? You wanna make money? You have good vagina and will make a lot of money." Id. at ¶10. He will also dispute the allegation that he, personally, "posted Victim-1 on the website Backpage.com," that he "took a cut of approximately $20 per customer from the money Victim-1 earned through engaging in prostitution on [his] behalf," that he "continued to allow Victim-1 to engage him," and that he, sans driving skills, driver's license or car, "drove Victim 1 to a location chosen by the customer to engage in commercial sex acts. Id. at ¶11. In this regard, the Court might consider that the Government did press an enhancement pursuant to §2G1.3(b)(2)(B) which penalizes a participant who "unduly influenced a minor to engage in prohibited sexual misconduct."

While it undermines the charge that he recruited them with an interactive computer service, Mr. Norris will likewise dispute that he "attempted to have Victim-2 engage in prostitution and used Victim-2 to recruit other girls on his behalf." PSR at ¶¶ 11, 13. He will deny that, after a brief departure "Victim-1 was joined by Victim-2 and another female who then was 15 years old ("Victim-3")." Mr. Norris will controvert the contention that the three girls were prostituting themselves for him. See PSR, at ¶¶ 12-13.

The victims may have paid a percentage of their earnings to someone, and a greater percentage to that someone or someone else as recompense for access to a residence, but neither percentage was paid to, or shared with, Mr. Norris. See PSR at ¶¶ 14-15.

Trial testimony of "Victim-2" in a companion case (United States v. Luidji Benjamin, 18-Cr-874 (JSR), illustrates the dubiosity of the claim that it was Mr. Norris who pushed these victims into prostitution. Victim 2, known as "TH" had been a ward of the N.Y.C. Administration for Children's Services since she was 12 (T. 61[4]). At age 12 TH created a Facebook account with the screen name "Aintthickerthandizz," on which she posted nude photos of herself and represented herself as 20-years-old (T. 130-31, 157-62). She testified that she had prostituted herself on Backpage.com (T. 82-82) while at ACS's Hawthorne, NY Cedar Knolls facility (T. 62) before her October 2015 first meeting with an older teen, billing himself as "Da Porn Star" on Facebook (T. 65, 170, 120-21, 159, 236-38). After a few days of drug use and consensual (save for age) sexual activity under his aunt's roof, TH showed "Da Porn Star," Luidji Benjamin, how to post naked pictures of her to Backpage (T. 60, 83, 107, 136-37, 154-55). Because she herself didn't own one, TH used Benjamin's phone to post ads she herself composed, featuring pictures of herself naked and of her performing a sex act on Benjamin (T. 96, 163, 311). For contact info, TH listed Benjamin's email address and phone number (T. 84, 86, 98). During peak periods, she met 5-6 clients per day and made hundreds of dollars (T. 88, 153). She left Benjamin at one point for a few days when he spoke abusively to her about her failure to earn but returned when he asked her to (T. 115-16).

---

[4] Referenced preceded by "T." refer to the transcript of the trial in United States v. Luidji Benjamin, Ind 18 CR 874 (JSR) that commenced May 8, 2019, over which Judge Rakoff presided.

TH was ultimately arrested on December 29, 2015 by Nassau County police for assaulting Benjamin with a bottle and stabbing him in the hand and chest (T. 38, 140, 142, 144-45, 264-65, 313). Benjamin secured an Order of Protection against her and TH never got near him again (T. 146, 147, 150). Somehow, however, within days of securing her freedom from Benjamin – and jail – new ads offering TH's reappeared on Craigslist (T. 314-15, 317, 320).

TH secured her release from jail and return to Cedar Knolls on a subsequent arrest by signing on as a prosecution witness in March 2018 and helping convict Benjamin of prostituting her (T. 120, 151). These circumstances – alleged enticement, victimization, assault on exploiter, arrest, accusation and then cooperation – suggest strongly that TH was not as powerless as depicted when Mr. Norris exploited her in a similar manner a mere months later. While she certainly deserves sympathy, Mr. Norris asks the Court whether TH's predispositions might differ from those of the prototypical victim whom the statute was promulgated to protect.

In the midst of being victimized by Mr. Norris, from August 9 to August 11, 15-year-old Victim 3 traveled to Scranton, PA, and posted herself on Backpage.com.  She was promptly arrested, falsely accused an individual named Adrian Smith of raping her, accused him, as well, of prostituting her, and, as a minor, again was not prosecuted. See <u>United States v. Adrian Smith,</u> Ind 3:16-cr-00296-RPC (MDPA).

As to the §3143(a)(1), determination whether Mr. Norris "pose[s] a danger to the safety of any other person or the community," we ask the Court to observe that because he did little more, federally chargeable, than provide a phone to an admittedly underage female, he represents no great risk to the community, at large, especially when he won't be leaving his mother's home. As to flight, the 25-year-old Mr. Norris, never-more-then-marginally employed, and barely-been-out-of-Brooklyn, is bereft of the means to flee. See PSR at ¶¶ 70, 107-110.

3.  <u>If Mr. Norris Did Violate Parole, That Violation Was Unknowing</u>.

To the extent that it influenced the Court's earlier conclusion that, were he to be released, he could not be trusted not to reoffend, Mr. Norris would like to add much-needed context to the perhaps technically correct conclusion that he was on parole when he became involved in the girls' scheme. See PSR, at ¶¶ 5(b), 56, 58, 113.  As his N.Y.S. Division of Parole supervising officer confirmed and counsel shared with the Government during plea negotiations, Mr. Norris signed parole termination papers in June 2016, upon which his obligation to report to the Division ceased. Documentation supporting that claim was requested pursuant to N.Y. F.O.I.L. on March 10, 2020 and will be shared with the Government and the Court upon receipt. While Mr. Norris may, technically, still have been on parole at the time of his involvement in the instant offense as his termination paperwork was being processed, there is no evidence whatsoever to suggest that he knew this. Notably in this regard, Mr. Norris has not been charged with any parole violation and no parole detainer has been lodged *in what began as a State offense*. See PSR at ¶ 64. Neither is there

any suggestion that he failed to report or otherwise comply with his release conditions during the two years that he was aware that he was being supervised.

The Sentencing Commission itself has concluded that there is no empirical support for the conclusion that committing one crime while on parole means that a defendant is likely to reoffend in the future. See March 22, 2010 DOJ Criminal Division Office of Policy and Legislation letter to U.S.S.C. at 11-12 & n.16 (http://www.src-project.org/wp-content/pdfs/public-comment/ussc_publiccomment_2010/DOJ_2010_Comment_Letter-on-Proposed-Amendments_FINAL_032110.2.pdf) (against the Commission's conclusion that § 4Al .1(d), aka the "status" provision, *contributes nothing to the predictive accuracy of the CHC*," arguing that the provision should be preserved because it promotes the 28 U.S.C. § 99l(b)(l)(A) goals of "just - even if harsher - punishment and deterrence.")

D.     Exacerbated By His HIV Affliction, Mr. Norris Incarceration In A Facility
       Infected By COVID-19 Establishes An Exceptional Reason To Release Him.

The Second Circuit has described "exceptional reasons" permitting the release of a defendant subject to mandatory detention as those that "present a unique combination of circumstances giving rise to situations that are of the ordinary.' United States v. DiSomma , 951 F.2d 494, 497 (2d Cir. 1991); United States v. Lea, 360 F.3d 401, 403 (2d Cir. 2004). This test "is necessarily a flexible one, and district courts have wide latitude to determine whether a particular set of circumstances qualifies as 'exceptional.' " Id.

The COVID-19 pandemic presents an equally elevated risk to both pretrial detainees and sentenced prisoners. While those with particular pre-existing health conditions are particularly vulnerable, as reflected by the death of a 20-year-old in Washington D.C., the virus can be deadly to the young and healthy, as well. See Keith L. Alexander, *After D.C. jail confirms first inmate with covid-19, officials isolate 36 other inmates,* Washington Post (March 26, 2020) (reporting first coronavirus-positive D.C. inmate, a 20-year-old) (https://www.washingtonpost.com/local/public-safety/after-dc-jail-confirms-first-inmate-with- covid-19-officials-isolate-36-other-inmates/2020/03/26/4610cd86-6f68-11ea-b148-e4ce3fbd85b5_story.html).

While E.D.N.Y. Chief Judge Mauskopf's April 3, 2020 Administrative Order (No. 2020-14) does not encompass the Westchester County Jail, there is no dispute that COVID-19 has infiltrated the facility and that the number of those infected is ascending.  Compare Gov't April 6, 2020 Opposition To Release In United States v. David Holland, 18 Cr. 908 (SHS) at p. 4 & n.2 (acknowledging the gravity of COVID-19 pandemic, its awareness that 24 inmates and 60 staff members at WCJ had tested positive for COVID-19 and that 9 more inmates and 64 staff members were awaiting test results) with the above-mentioned April 17, 2020 email from AUSA Perry Carbone to Judge Seibel re Westchester County Jail COVID-19 Stats.  It is likewise readily apparent that the infected-in-prison bell curve lags behind the perhaps-plateauing distribution in free society. Before placing too much faith in the Westchester Department of Corrections' representations by proxy, we encourage the Court to familiarize itself with the story of the BOP facility that has (so far) suffered the most COVID fatalities. See Janet Reitman, *'Something Is Going to Explode': When Coronavirus Strikes a Prison*, The NY Times Magazine, April 18, 2020 (An oral history of the firs the federal

prison system, in Oakdale, La.). Indeed, WCJ has tested five times as many staff members as inmates, half of whom have had the virus.  Almost ninety percent of the far fewer inmates tested were infected.

According to the statistics the BOP reports daily pursuant to Judge Mauskopf's  Administrative Order, as of April 19, 22 of BOP's 493 inmates had died from COVID-19 but none of the 309 afflicted staff members had died. See https://www.levittandkaizer.com  An obvious reason for the fatality rate disparity is that staff are tested and treated sooner and have access to better care should they test positive. A likely contributing factor is that staff are not subject to the same viral load levels, that is, they have lower levels of the virus in their body because they are not in contact with contaminated persons all day every day. Higher viral loads make it more difficult for the body's immune system to effectively combat the virus. An additional 155 inmates and 29 staff have recovered from COVID infections.

As are many questions concerning COVID, the threat it presents to the HIV-afflicted is as yet unclear. See https://www.thelancet.com/journals/lanhiv/article/PIIS2352-3018(20)30111- 9/fulltext (April 15, 2020); https://www.cdc.gov/coronavirus/2019-ncov/need-extra- precautions/hiv.html ("the risk of serious illness from COVID-19 for people with HIV is not known"). The CDC commonsensibly advises that the best way to prevent getting sick *is to avoid exposure to the virus*. Id. (emphasis added). Because staying healthy helps your immune system fight off infection, people with HIV should take everyday preventive actions to help prevent the spread of COVID-19, including maintaining a healthy lifestyle by eating right, getting at least 8 hours of sleep, and reducing stress as much as possible. Id. It is likewise important that those with HIV keep taking their HIV medicine, to continue your treatment and follow the advice of your health care provider.).

Some types of HIV medications are being evaluated in clinical trials to treat COVID-19, but there are no data available yet showing that these drugs actually treat COVID-19. CDC "Dear Colleague" Letter https://www.cdc.gov/hiv/policies/dear-colleague/dcl/032020.html (March 20, 2020). CDC's recommendations to the HIV-afflicted to protect themselves from COVID-19 include having at least a 30-day supply of HIV medicine available, *avoiding close contact with people who are sick*, practicing good hand washing and *avoiding large crowds and gatherings*. Id. (emphasis added).

Like all of the incarcerated, Mr. Norris has little control over his own living conditions or personal regimen. He reports that, while each has his own cell, the 50 men in the full "Pen F-1" block in which he is housed are still fed in a communal living area and share two showers and two telephones.  According to his medical records, the last time his T-cell count was checked was December 5, 2019, prior to the pandemic.

Two weeks ago, the New England Journal of Medicine published an article discussing the effect COVID-19 and similar respiratory diseases could be expected to visit on the particularly vulnerable populations of our nation's prisons. See Matthew J. Akiyama, M.D., Anne C. Spaulding, M.D., and Josiah D. Rich, M.D,, *Flattening the Curve for Incarcerated Populations — Covid-19 in Jails and Prisons,* NEJM April 2, 2020, attached as Exhibit _.

(opining that restricted movement, confined spaces, and limited medical care heightened the risk that novel highly transmissible respiratory pathogens posed to prisoners warranted "decarcerating," releasing, as many people as possible. The symptoms often start in the back of the throat with a sore throat. See generally Pam Belluck, *What Does the Coronavirus Do to the Body*?, New York Times (March 26, 2020), available at https://www.nytimes.com/article/coronavirus-body-symptoms.html?; Elena Ryzik & Nancy Coleman, *As Tekashi69 Is Released, Inmates Fearing Coronavirus Ask, 'Why Not Me?,* N.Y. Times (April 2, 2020) available at https://www.nytimes.com/2020/04/02/arts/music/tekashi69- free-prison-coronavirus.html?action=click&module=Latest&pgtype=Homepage. As copies of the virus multiply, they burst out and infect neighboring cells, crawling "progressively down the bronchial tubes." Id. When the virus reaches the lungs, their mucous membranes become inflamed, which can damage the alveoli or lung sacs requiring them to work harder to carry out their function of supplying oxygen to the blood and removing carbon dioxide. Id. "If you get swelling there, it makes it that much more difficult for oxygen to swim across the mucous membrane," said Dr. Amy Compton-Phillips, the chief clinical officer for the Providence Health System, which included the hospital in Everett, Wash., that had the first reported case of coronavirus in the United States, in January. Id. The swelling and the impaired flow of oxygen can cause those areas in the lungs to fill with fluid, pus and dead cells. Pneumonia, an infection in the lung, can occur.  Id.

Were the Court to release him, Mr. Norris's masked mother, Erica Norris, would pick him up, provide him a face mask, bring him home for a 14-day self-quarantine and provide for him for the duration. Now working from home, PSR at ¶ 14, Ms. Norris would monitor her son's mental health and ensure that he did not worsen his circumstances. She will oversee his compliance with his release conditions, as well. Mr. Norris fully understands that he would simply be exchanging a cell in Brooklyn for one in Westchester until he is sentenced or the threat dissipates. While counsel has managed to maintain some infrequent telephonic contact with Mr. Norris during this crisis, closed lines of communication have been an impediment to proper preparation for the likely/expected *Fatico* hearing on the precise contours of Mr. Norris role in the offense and the victims' activities both prior, and subsequent, to their purported exploitation by Mr. Norris. See United States v. Kennedy, 18 Cr. 20315 (E.D. Mich. March 27, 2020) (post-plea presentence] release of defendant whose pretrial release was revoked because "the COVID-19 pandemic constitutes an independent compelling reason" for temporary release and "is necessary for Defendant to prepare his pre-sentence defense").

E.      There Is Ample Authority Supporting Release.

As the Court is no doubt aware, other courts in this and adjacent districts and around the country have granted release to vulnerable defendants awaiting sentencing because of the increased risk of serious illness or death should they become infected with COVID-19. See, e.g., United States v. Carr, 19-cr-137 (ARR) 2020 WL 1872571 (E.D.N.Y. April 14, 2020)(where government could not dispute that it increased his risk of severe symptoms were he to contract COVID-19, detainee's pre-existing hypertension asthma and history of brain aneurysm in facility with COVID-19 cases constituted exceptional reasons justifying §

3145(c) release); United States v. Nkanga, No. 18-CR-713 (JMF), 2020 WL 1529535, at *2–4 (S.D.N.Y. Mar. 31, 2020) (finding that risk that COVID-19 posed to defendant with history of asthma and stroke constituted exceptional reason for release under § 3145(c) but that court lacked power to order release under § 3145(c) after it had already sentenced defendant); Order at 3 v. McKenzie, No. 18 Cr. 834 (PAE) (S.D.N.Y. Mar. 30, 2020), ECF No. 443 (finding asthmatic's detention in facility with multiple confirmed COVID-19 cases an exceptional reason justifying 18 U.S.C. § 3145(c) release); Order at 2–4, United States v. Roman, No. 19 Cr. 116 (KMW) (S.D.N.Y. Mar. 27, 2020), ECF No. 155 (finding detainee's hypertension and history of brain aneurysm in facility with COVID-19 cases exceptional reasons justifying § 3145(c) release); United States v. Witter, No. 19 Cr. 568 (SHS), Dkt. 40 at 2–3 (S.D.N.Y. Mar. 26, 2020) (granting § 3145(c) bond to drug defendant); United States v. Vizzari, 19 Cr. 767 (VSB) (SDNY March 20, 2020) (granting § 3145(c) release to parole violating drug defendant because his age and health conditions presented exceptional COVID risk); United States v. Stephens, 15 Cr. 95 (AJN) (SDNY March 19, 2020) (releasing defendant and noting that "[a] comprehensive view of the danger the Defendant poses to the community requires considering all factors," including COVID-19); United States v. Eli, 20 Cr. 50 (RJD) (RER) (EDNY March 24, 2020) (releasing, over government's objection, defendant charged with multiple robberies involving guns and drugs, because of COVID risk); United States v. Meekins, 18 Cr. 222 (D.D.C. March 31, 2020) (due to extraordinary danger COVID-19 poses to individuals in detention, granting § 3145(c) release to defendant with three pending assault charges); United States v. Hector, Case No. 18 Cr. 3 (W.D. Va. March 27, 2020) (granting release pending sentencing after Fourth Circuit remanded and required detaining court to specifically consider extraordinary danger posed by COVID-19 to defendants in prison); United States v. Mclean, 19 Cr. 380 (D.D.C. March 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, see 18 U.S.C. § 3142(e), but tilts the balance in favor of release."). See also Rose v. Baker, No. 17-15009, Dkt. No. 62 (9th Cir. Apr. 9, 2020) (noting, in granting bail to child sex abuser pending resolution of habeas case, that COVID-19 is "a global crisis . . . that is heightened for [] prisoners" one of "the most vulnerable groups among us" (quoting Coleman v. Newsom, F. Supp. 3d_, 2020 WL 1675775 (E.D. Cal / N.D. Cal. 2020))(special 3-circuit-and-district-judge panel ); United States v. Eli, 20 Cr. 50 (RJD) (RER) (EDNY March 24, 2020) (releasing, over government's objection, defendant charged with multiple robberies involving guns and drugs, because of COVID risk); Order at 1, United States v. Padin, No. 20-CR-135-5 (JMF) (S.D.N.Y. Apr. 8, 2020), ECF No. 84 (finding "compelling reason" justified temporary release on bail under § 3142(i) because defendant's asthma placed him at heightened risk from COVID-19); United States v. Perez, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (granting defendant's bail application in light of "the unique confluence of serious health issues and other risk factors facing this defendant, . . . which place him at a substantially heightened risk of dangerous complications should he contract COVID-19").

Counsel is unavailable to appear personally to argue this application for the foreseeable future. While he is in good health, his spouse is afflicted with cancer and is both post-chemotherapy and post-radiation treatment, placing her in the category of individuals most vulnerable to fatal viral symptoms, should she become infected. In order to reduce her risk of infection, counsel has relocated his family out of N.Y.C., a Corona-viral hot zone, to the far east end of Long Island, where the number of positive cases per capita pales in comparison.

Given his current responsibilities as the principal caretaker of both his spouse and children and having been advised by his spouse's neuro-oncologist that any visit to N.Y. be followed by a 14-day self-quarantine, counsel feels compelled to remain away from N.Y.C., for as long as the virus remains a threat. For these reasons, Counsel would ask that any proceeding be handled remotely or by associate counsel, who has Mr. Norris' trust and consent.

F.  <u>Conclusion</u>

For the forgoing reasons, Mr. Norris respectfully requests that the Court release him on the conditions suggested herein.


Respectfully submitted,


Bruce Kaye, Esq.


Thomas Eddy, Esq.


cc.: AUSA Jacob Gutwillig